1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

RICKEY JOSEPH ROBERTS,
                    Petitioner,
          v.

LANDON BIRD, Warden,
                    Respondent.

Case No.  21-01744 BLF (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK**

Petitioner has filed a *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his 2018 criminal conviction.  Dkt. No. 1 ("Petition").  Respondent filed an answer on the merits.  Dkt. No. 12 ("Answer").  Petitioner has filed a traverse.  For the reasons set forth below, the petition is **DENIED**.

## I.  BACKGROUND

A jury convicted Petitioner of second degree murder and making criminal threats. Dkt. No. 13-3 at 830-31; *see also* Cal. Pen. Code, §§ 187(a), 422.  Petitioner was sentenced to 18 years to life in state prison, consisting of an indeterminate term of 15 years to life on count 1 to be served after a 3-year determinate term on count 2.  Dkt. No. 13-3 at 993-94.

On January 29, 2020, the California Court of Appeal ("state appellate court") affirmed the judgment.  Dkt. No. 13-7 at 212-41; *see also People v. Roberts*, No. A155212, 2020 WL 477383 (Cal. Ct. App. Jan. 29, 2020) (unpublished).  On April 22, 2020, the California Supreme Court summarily denied a petition for review.  Dkt. No. 13-7 at 317.

United States District Court
Northern District of California

When the last state court to adjudicate a federal constitutional claim on the merits does not provide an explanation for the denial," the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale." *Wilson v. Sellers*, ⸺ U.S. ⸺, 138 S.Ct. 1188, 1192 (2018).  "It should then presume that the unexplained decision adopted the same reasoning." *Id.*  Here, the California Supreme Court did not provide an explanation for its denial of the petition for review.  Dkt. No. 13-7 at 317.  Petitioner did not argue that the California Supreme Court relied on different grounds than the state appellate court.  *See generally,* Pet.  Accordingly, this Court will "look through" the California Supreme Court's decision to the state appellate court's decision.  *See Skidmore v. Lizarraga*, No. 14-CV-04222-BLF, 2019 WL 1245150, at *7 (N.D. Cal. Mar. 18, 2019) (applying *Wilson*).

Petitioner filed the instant federal habeas petition on March 12, 2021. *See* Dkt. No. 1.  He asserts seven claims of error, none of which warrants habeas relief.

## II. STATEMENT OF FACTS

The following background facts are from the opinion of the state appellate court on direct appeal:

> Defendant was charged with murder (§ 187, subd. (a); count 1) and making criminal threats (§ 422; count 2), following a violent incident which occurred at a senior citizen housing complex in San Francisco where defendant and the victim, O.C., lived in separate apartments.
>
> ***The Prosecution's Case***
>
> ***i) The December 13, 2015 Assault***
>
> Security guard Elamin Clark was working an early morning shift at the housing complex on the day of the incident. O.C. found him in the kitchen by the community room and asked him to call 911. She appeared to be in pain and needed to go to the hospital. Clark noticed a bruise on her forehead. He walked with her to her apartment to get her jacket. The jury watched a video of their interaction.
>
> An audiotape of Clark's 911 call was played in court. Clark told the operator that O.C. reported her head and neck were hurt. He

also relayed that she had been abused and had identified defendant as her abuser. O.C. can be heard crying in the background. When police arrived, Clark guided them to defendant's apartment.

Fire department captain Michael Mason testified that he responded by ambulance to O.C.'s apartment building around 6:00 a.m. O.C. walked to the ambulance with a security guard and had a steady gait. She reported that she had been physically assaulted. She said she was struck in the head and lower back multiple times with closed fists and had been choked, after which she fell to the ground and lost consciousness. Mason observed a bruise on the right side of her head, a depression behind her right temple, redness around her neck, and lacerations on her lips. She reported pain on the left side of her head as well as her lower back.

O.C. was alert but slow to respond when asked what year it was. She remained alert en route to the hospital. She was unable to tolerate a cervical spine collar. Mason decided to transport her to a trauma center with lights and sirens because she had a head injury and was on Plavix, a blood thinner. Mason explained that people who take blood thinners are vulnerable to internal bleeding, especially brain bleeding, if they experience any sort of trauma.

Officer Miguel Cortez spoke to O.C. in the back of the ambulance. She reported she had been in an altercation with defendant in her apartment. She was crying, squirming, whimpering, and appeared to be in pain. Cortez noticed cuts on her head and lip and marks on her face and neck. Officer Cortez was admitted into defendant's apartment, where he found defendant lying on a couch asleep. He shook defendant awake and asked what had happened to O.C. Defendant said, "She kept pushing me so I went off." He smelled of alcohol and had bloodshot, watery eyes and slurred speech, but denied he had been drinking. On his back were several evenly spaced scratches that were a bit scabbed over. Defendant said O.C. had scratched him. Cortez arrested defendant.

Officer Anthony Sharron took photographs of O.C. in the back of the ambulance. The photos showed red marks on the right side of her neck, redness and swelling to her lips, bruising to her cheek, and redness to her right ear. Sharron testified that O.C. was crying and her hands were shaking. She was complaining of pain to her head and face and was having difficulty breathing. She told Sharron she was sleeping in her apartment when defendant woke her up by yelling and causing a disturbance. He punched her multiple times in the head and face area with closed fists and then used both hands to choke her neck, stating, "I will fucking kill you." She lost consciousness while being choked. When she woke up she was on the floor. She went to the building

United States District Court
Northern District of California

lobby to seek help. She said defendant was drunk and they had not argued before the assault occurred.

Sergeant David Almaguer went to the hospital later that morning and saw O.C. in the emergency room, unconscious and unresponsive. Almaguer went to O.C.'s apartment and then to the police station to meet defendant. Defendant had injuries to his left hand and scabbed-over scratches on the lower portion of his back. Almaguer asked defendant about dried blood he had found on the inside of O.C.'s door. Defendant stated it was likely blood from his finger. He denied hitting, choking, or threatening O.C. He acknowledged that he had placed his hands on her neck.

The jury heard an audio recording of a *Mirandized* [FN2] interview conducted the day after the incident. Defendant explained he had been sleeping in O.C.'s apartment when she suddenly woke him up and asked him to leave. She then bit his hand. She was hysterical. He rushed to leave but could not find his clothes, putting on O.C.'s pants by mistake. She was blocking his path to the door so he pushed her aside to get out. He denied hitting or choking her, stating that he only grabbed her by the shirt collar to move her out of his way. He did not see her fall. He said she was a delicate bleeder and bruised easily.

[FN2 *Miranda v. Arizona* (1966) 384 U.S. 436.]

Defendant did not know how he got the scratches on his back but said, " 'She must have hit me with something.' " He said his hands were around her neck for less than a minute. He did not intend to hurt her, only to get her to back off so he could leave. He did not want to be around her when she was "in that state." When his hands were on her neck, he thought about how much her bite had hurt him and that this was not the first time she had bitten him. But he denied that his temper got the best of him, saying, "I was, like I say, I was still like half–asleep. Okay?" When asked to explain why he told officers that he "just went off," he said, "I just pushed her to get, to move her back from me." O.C. died three days after the assault following a failed surgery to treat an intracranial hemorrhage.

Dr. Amy Hart, a medical examiner and an expert in forensic pathology, conducted O.C.'s autopsy. Dr. Hart identified 19 blunt force injuries to O.C.'s head, neck, torso, and extremities. She stated that O.C.'s brain swelled due to a blunt impact to the right side of the head that damaged the left side of the brain. This kind of injury is referred to as a "contrecoup" or a "rebound" lesion. The injury probably resulted from her head being in motion at the time of impact. This kind of injury is commonly seen when an individual is pushed into an object or is not able to brace themselves from impact when they fall. The injury to the right side of O.C.'s head occurred at the same time as the injury to the left side of the brain. Her cortical ribbon was damaged, which is consistent with an injury to the surface of the

Case No. 21-01744 BLF (PR)
ORDER DEN. PET. FOR WRIT OF HABEAS CORPUS; DEN. CERTIFICATE OF APPEALABILITY

brain. The brain hemorrhage was below the membrane, which is usually a marker for trauma.

Dr. Hart concluded the cause of O.C.'s death was blunt trauma with neck compression. The manner of death was homicide, based on the distribution of contemporaneous injuries over multiple planes of O.C.'s body. This pattern of injuries is most consistent with another person having caused the trauma. Dr. Hart stated that the findings of O.C.'s scans, angiogram, and autopsy were not consistent with a hypertensive hemorrhagic stroke. When shown a photograph of the red marks on defendant's back, Dr. Hart stated that it would have taken many hours or days for the scab to have formed.

### ii) Evidence of Prior Domestic Violence

Officer Lauren Newhart visited O.C.'s apartment building in November 2014 following a 911 call. O.C. had an egg-sized lump on her upper right shoulder and bruising to her right wrist and under her right eye. O.C. told Newhart she was afraid to call the police because defendant had said that if she did, " 'he would beat me so bad he wouldn't care if he went to jail because I'd be dead.' " She was upset, tearful, crying, and fearful for her life.

O.C. reported that the two had argued in his apartment after she refused to marry him. He became angry and grabbed her right wrist and started punching her in the head and other parts of her body. She was able to get away when his brother called on the phone. O.C. and defendant had been dating for about two and a half years. He had assaulted her before, but she had not reported it to the police. The last time he assaulted her was about four months before when he grabbed her by the neck and threw her down on the ground.

Newhart and other officers went to defendant's apartment but he refused to open the door. They broke down the door and arrested him. Defendant denied striking O.C. He seemed apologetic but calm. He said O.C. was upset and "blew up and got all out of whack you know." He initially denied touching her, saying he "just tried to stay as far away from her, because she goes in her mood swings you know." He later admitted, " 'I just grabbed her and told her to go home.' "

Dr. Sacha Niemi saw O.C. in December 2014. O.C. had significant bruising along her right upper cheek and her entire right arm. Dr. Niemi was concerned for O.C. and gave her information about shelters and other resources. Dr. Niemi saw O.C. again in March 2015 after O.C. fell on a bus. O.C. suffered a stroke in August 2014 and had been recently prescribed blood thinners after a stent was placed in her heart.

During a follow-up visit two months later, O.C.'s phone was incessantly ringing. O.C. said she was ignoring her ex's calls.

Case No. 21-01744 BLF (PR)
ORDER DEN. PET. FOR WRIT OF HABEAS CORPUS; DEN. CERTIFICATE OF APPEALABILITY

5

United States District Court
Northern District of California

When she finally answered, Dr. Niemi heard a voice yelling and cursing her. Dr. Niemi got on the phone and was cursed by defendant as well. He was aggressive, belligerent, and irate, and threatened to go to the doctor's office. O.C. informed Dr. Niemi that her ex was stealing her blood thinners and nitroglycerin pills. Defendant only gave her the pills if she did what he wanted. Dr. Niemi called the pharmacy to rush her a new supply of medications. She then called O.C.'s social worker to report what had happened and to see if O.C. could be moved to a safer location. During her next office visit in July 2015, O.C. had new bruising on her right ribcage area. O.C. said she had been attacked by her ex two weeks before, resulting in a broken finger and a broken patella. Dr. Niemi referred her for orthopedic follow up.

Connie Swain worked for an agency that assists domestic violence victims. O.C. came to her in November 2015, saying she thought her partner was getting into her residence. She wanted to change her locks and to be transferred to safer housing. She said that her partner had choked her in the past and she was afraid. Swain helped O.C. fill out a form for an emergency transfer to another public housing unit. Swain submitted the transfer request but O.C. never provided the necessary supporting documents, including a police report and a restraining order.

John McDonald was a social worker who worked at O.C.'s apartment complex and had seen defendant when he was intoxicated. In November 2015, McDonald met with O.C. She said defendant had taken her keys and choked her. He met with O.C. and Swain to discuss getting a restraining order. O.C. later told McDonald she had obtained a restraining order but did not have the funds to have it served on defendant. McDonald advised that there are agencies that help pay to serve restraining orders.

A.C., O.C.'s older sister, testified that two weeks before the assault, O.C. mentioned that defendant had threatened to kill her because she would not have sex with him. O.C. said defendant had beaten and choked her, and A.C. observed bruises on her neck. The parties stipulated that A.C. never witnessed defendant assaulting O.C. Several phone messages left by defendant on O.C.'s cell phone in September and November 2015 were played for the jury. In many messages, defendant cursed repeatedly and threatened to beat and kill O.C. or have her killed by others.

### iii) Expert Testimony on Intimate Partner Battering

Nancy Lemon, an expert witness in domestic violence and intimate partner battering, testified generally about the patterns and cycles of domestic violence. Lemon testified without knowledge of the specific facts of the present case. Lemon

described the cycle of violence as a progression of abusive behavior. The cycle has three phases, the romantic "hearts-and-flowers" stage, the "tension-building" stage, and finally the "explosive release of tension." Such explosions will become increasingly violent over time. After an explosion, the relationship will go back to the romantic stage with the abuser apologizing. The cycle may repeat. If the victim tries to leave, the abuser can feel rejected and try to exert control again. Lower–income people can have a harder time leaving an abusive relationship because it is hard to find alternative shelter. A person living in the same building as an abuser who felt unable to leave, "would just try to placate the other person to try to keep them from getting violent."

Lemon also described different ways that abusers attempt to exert their power and control over a partner, including coercion, threats, and isolation. Threats to kill the victim can be very effective if there has been prior physical or sexual violence. The prosecutor posed a hypothetical to Lemon involving a victim in a doctor's office receiving an abusive phone call. In this hypothetical, "the female victim tells the doctor that the individual had been taking her medication[,] nitro, for her heart and blood thinners" in order to get her to do what he wants. Lemon responded that the behavior sounded extremely dangerous for the victim, and that it seemed "like another example of extremely controlling behavior where the abusive party is using whatever means they can think of in that particular relationship to intimidate, threaten, and control their partner."

Lemon said it is common for victims to stay in abusive relationships. They may do so out of fear, shame, financial dependence, love, immigration status, religious pressure, or the hope that the person will change. If a party cannot separate from the abuser, he or she might be reluctant to participate in a criminal prosecution. It also is not unusual for a person to have been abused for a long time before filing a report. Abusers will commonly try to discourage victims from reporting abuse. Abusers commonly minimize inflicted bruises by saying that the victim bruises easily. Lemon also stated that while mutual domestic violence occurs, it is very rare.

### Defendant's Case

Dr. Richard Medoff treated O.C. on two separate occasions in the emergency room. In March 2015, she fell backward on a bus and sustained a bruise on the back of her head. She reported some neck pain. Because she was on blood thinners, she received a head scan to make sure there was no bleeding in the brain. O.C. received another brain scan after a fall in September 2015, in which the results came back negative. Neither of the two injuries appeared to be consistent with a punch. When shown a postmortem photograph of the back of O.C.'s head, Dr.

Medoff opined that such an injury could cause fatal intracranial bleeding in a person on blood thinning medication.

Sergeant Esther Gonzalez investigated the November 2014 incident. During the interview, O.C. told her she had been hit on the head and choked. She had difficulty recalling the series of events and how they transpired. She initially described falling asleep and waking up to defendant manipulating her feet. An audio recording of this interview was played for the jury. O.C. stated she and defendant had been arguing about sex, not marriage, but she did not disclose this initially because she believed the male officers were laughing at her. She also said defendant had mental health issues and was on medication. She did not know if he was schizophrenic or bipolar. She did not know how she got her shoulder bruise but said she had been hit in the head, even though she had reported a shoulder injury.

Defendant's older brother H.R. testified that he often stayed at defendant's apartment. Defendant would spend the night at O.C.'s apartment on those occasions. H.R. was staying in defendant's apartment at the time of the assault. H.R. left for work around 4:00 p.m. and returned at about 10:00 p.m. O.C. and defendant were in the apartment watching television. They later went up to her apartment and H.R. went to sleep on the couch. He was awakened by O.C. pounding on the patio glass door at around 5:00 a.m. She asked H.R. to come up to her apartment and get his brother and then left. She looked angry and unhappy. He did not notice any physical signs of struggle or trauma. Shortly thereafter, defendant arrived, wearing only a pair of jeans that were too small for him. He and defendant went back to sleep. About an hour later, the police came to the door.

H.R. did not see any injuries to defendant's hands or back. Defendant did not say that he had been in a fight or that he had acted in self-defense. H.R. said defendant uses a lot of foul language and gets loud and angry when he is drinking. H.R. was aware that O.C. had filed a restraining order against defendant in November 2015. O.C. never complained to H.R. about defendant hitting her. After defendant's arrest, he asked H.R. to get rid of medications that were in the apartment. None of the medications had O.C.'s name on them. Recordings of two jailhouse phone calls with defendant were played for the jury.

### Defense Expert Testimony

Dr. Judy Melinek testified as an expert witness in forensic pathology, wound interpretation, and neuropathology. Dr. Melinek agreed with Dr. Hart that the manner of death was homicide but disagreed as to the cause of death. In her opinion, death was caused by blunt trauma to the head exacerbated by the presence of high blood pressure and the use of the blood thinner Plavix. The actual trauma was not significant, and for a person not on Plavix the injury was probably survivable.

Dr. Melinek did not believe there was enough evidence to conclude O.C. had been strangled or that there had been neck compression. It did not appear that defendant had slammed O.C. against a wall because there were no lacerations to the scalp and no skull fractures underneath the head contusion. Bleeding was not indicative of a contrecoup injury, but rather of a hypertensive bleed, caused when a spike in blood pressure leads to bleeding in the brain. The CT scans showed the initial impact was not forceful enough to cause immediate bleeding into the brain. That the brain injury was delayed was supported by the fact that O.C. could walk and talk right after the injury occurred. Dr. Melinek concluded O.C. died of a stroke, though the underlying cause of death was the injury to the right side of her head from blunt force trauma at the hands of another.

Dr. Melinek further explained that O.C.'s blunt force trauma injuries were consistent with having been pushed on her collarbone area and falling on an uneven surface. The stroke exacerbated the head injury and was an indirect complication of the blunt trauma. As to the scratches on defendant's back, Dr. Melinek thought the injuries were made by a tool or weapon, not fingernails. The abrasions looked fresh to her. She agreed the injuries on defendant's hand could have been defensive fingernail marks inflicted during a strangulation.

*Roberts*, 2020 WL 477383, at \*1–5.

## III.  DISCUSSION

### A.  <u>Legal Standard</u>

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Rose v. Hodges*, 423 U.S. 19, 21 (1975).  The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

United States District Court
Northern District of California

United States District Court
Northern District of California

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. *Id.* at 412; *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir.), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. "Under § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

**B.    Claims and Analyses**

Petitioner raises the following seven claims in this federal habeas petition:

(1) the trial court failed to instruct on voluntary manslaughter under the theory of heat of passion;

(2) the trial court improperly excluded evidence of the victim's mental illness;

United States District Court
Northern District of California

(3) the trial court refused to answer a jury question during deliberations;

(4) the trial court improperly permitted multiple witnesses to relay hearsay testimony as to what the victim said about prior incidents of domestic violence;

(5) the trial court erred by admitting the 911 call made by the security guard who had relayed that the victim identified Petitioner as the assailant;

(6) the trial court erred by instructing the jury that it could consider expert testimony on intimate partner battering in evaluating the victim's credibility; and

(7) cumulative error.

### 1.    Failure to Instruct

#### a.    Background

In his first claim, Petitioner asserts that the trial court had a duty to instruct the jury on voluntary manslaughter based on heat of passion.  The trial court, however, found that the evidence did not warrant this instruction. Instead, it instructed on voluntary manslaughter in connection with the theory of imperfect or unreasonable self-defense.  *See Roberts*, 2020 WL 477383, at *6.

#### b.    The State Appellate Court's Rejection of This Claim

The state appellate court rejected Petitioner's failure-to-instruct claim, agreeing with the trial court that there was insufficient evidence to support this instruction in the first place:

> *A. Relevant Law*
>
> " '[A] trial court must instruct on lesser included offenses, even in the absence of a request, whenever there is substantial evidence raising a question as to whether all of the elements of the charged offense are present.' [Citation.] Conversely, even on request, a trial judge has no duty to instruct on any lesser offense unless there is substantial evidence to support such instruction. [Citation.] ' "Substantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive." ' " (*People v. Cunningham* (2001) 25 Cal.4th 926, 1008.) " 'This substantial evidence requirement is not satisfied by " 'any evidence ... no matter how weak,' " but rather by evidence from which a jury

composed of reasonable persons could conclude "that the lesser offense, but not the greater, was committed." [Citation.] "On appeal, we review independently the question whether the trial court failed to instruct on a lesser included offense." ' " (*People v. Souza* (2012) 54 Cal.4th 90, 116.)

"Murder is the unlawful killing of a human being ... with malice aforethought." (§ 187, subd. (a).) "Manslaughter is the unlawful killing of a human being without malice." (§ 192, subd. (a).) Manslaughter is a lesser included offense of murder, and a defendant who commits an intentional and unlawful killing but who lacks malice is guilty of voluntary manslaughter.

"Heat of passion is one of the mental states that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter." (*People v. Nelson* (2016) 1 Cal.5th 513, 538.) "A heat of passion theory of manslaughter has both an objective and a subjective component." (*People v. Moye* (2009) 47 Cal.4th 537, 549.) To satisfy the objective component, the defendant must have reacted to provocation " 'that would cause an emotion so intense that an ordinary person would simply react, without reflection.' " (*People v. Rangel* (2016) 62 Cal.4th 1192, 1225, quoting *People v. Beltran* (2013) 56 Cal.4th 935, 949 (*Beltran*).) To satisfy the subjective component, the defendant must have experienced emotion " 'so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene.' " (*Rangel*, at p. 1225.) Heat of passion is inapplicable absent evidence that " 'the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.' " (*People v. Barton* (1995) 12 Cal.4th 186, 201 (*Barton*).)

### B. Analysis

Defendant contends there was substantial evidence to instruct on a heat of passion defense. He argues he was provoked by O.C. waking him up, biting his finger hard enough to draw blood, and inflicting scratches on his back. O.C.'s actions caused him to became [*sic*] "enraged," and he "probably feared that she would continue biting him unless he did something to stop her." Defendant also notes he told the police that he "went off" on O.C. after she bit him, and asserts these facts are more compelling than the facts in *Barton*. We disagree.

The defendant in *Barton* was convicted of voluntary manslaughter. (*Barton, supra*, 12 Cal.4th at p. 190.) On appeal he argued that the trial court erred by giving a heat of passion instruction over his objection. (*Id.* at p. 194.) The Supreme Court disagreed, finding sufficient evidence of provocation to support a heat of passion instruction. The victim in *Barton* tried to run

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

the defendant's daughter's car off the road and spat on the window of her car. When confronted by the defendant, the victim acted " 'berserk,' " taunted the defendant, and assumed a fighting stance. The argument escalated, with the defendant screaming and swearing at the victim and ordering him to " 'drop the knife' " before shooting the victim. (*Id.* at pp. 201–202.) *Barton* bears no similarity to the present case. There was substantial evidence from which a reasonable jury could find that the defendant feared for his life and was so enraged over the treatment of his daughter that that he lost the ability to process the situation rationally. (*Ibid.*)

In this case, while there was evidence O.C. woke the defendant up and drew blood when she bit his hand and scratched his back, there was no evidence that defendant was so overcome with emotion that his judgment was obscured. On the contrary, defendant told police officers that after O.C. bit him, he hurriedly tried to find his clothing so that he could leave her apartment. He denied hitting or choking her, stating that he merely pushed her away from the door so that he could exit. Defendant also denied that he was angry with her, telling police, "I was still like half-asleep. Okay?" His brother H.R. also testified that defendant returned to his apartment and immediately fell asleep, giving no indication that he was upset. Defendant's statement to police that he "went off" is too vague and insubstantial to form the evidentiary basis for a heat of passion instruction. "[C]ase law and the relevant jury instructions make clear the *extreme intensity* of the heat of passion required to reduce a murder to manslaughter." (*Beltran*, *supra*, 56 Cal.4th at p. 950, italics added.) Defendant never clarified what he meant by the phrase "went off." When pressed by the officer, he said he was not angry and used only minimal force to move O.C. from the door.

The more apt comparison is to *People v. Gutierrez* (2009) 45 Cal.4th 789. In *Gutierrez*, the "[d]efendant ... testified that [the victim] scratched his chest, he kicked her, she kicked him in the leg and grabbed his shirt, and he pulled away.... [R]ather than causing defendant to become enraged, defendant testified that he simply walked away." (*Id.* at p. 827.) The appellate court concluded that a voluntary manslaughter instruction was not required under the circumstances because "[s]imple assault, such as the tussle defendant described, also does not rise to the level of provocation necessary to support a voluntary manslaughter instruction." (*Ibid.*) We conclude the trial court did not err in refusing the requested instruction.

24

*Roberts*, 2020 WL 477383, at *6-8.

25

**c.  Analysis**

26
27
28

Petitioner is not entitled to habeas relief on his claim that the trial court erred in failing to instruct the jury on voluntary manslaughter based on heat of passion. Due process requires that " 'criminal defendants be afforded a meaningful opportunity to present a complete defense.' " *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). A criminal defendant is entitled to adequate instructions on the defense theory of the case. *See Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 2000) (error to deny defendant's request for instruction on simple kidnapping where such instruction was supported by the evidence). However, due process does not require that an instruction be given unless the evidence supports it. *See Hopper v. Evans*, 456 U.S. 605, 611 (1982). Nor is the defendant entitled to have jury instructions raised in his or her precise terms where the given instructions adequately embody the defense theory. *United States v. Del Muro*, 87 F.3d 1078, 1081 (9th Cir. 1996). The omission of an instruction is less likely to be prejudicial than a misstatement of the law. *See Walker v. Endell*, 850 F.2d 470, 475-76 (9th Cir. 1987) (citing *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977)). Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an " 'especially heavy burden.' " *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting *Henderson*, 431 U.S. at 155). The significance of the omission of such an instruction may be evaluated by comparison with the instructions that were given. *Murtishaw v. Woodford*, 255 F.3d 926, 971 (9th Cir. 2001) (quoting *Henderson*, 431 U.S. at 156).

Instructional errors are subject to harmless error analysis. *See Hedgpeth v. Pulido*, 555 U.S. 57, 60-61 (2008); *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993). An instructional error is considered harmless unless there is a "reasonable probability" that the jury would have arrived at a different verdict had the instruction been given. *Byrd v. Lewis*, 566 F.3d 855, 860 (9th Cir. 2009).

United States District Court
Northern District of California

United States District Court
Northern District of California

The Court first notes that the failure to instruct on a lesser-included offense in a non-capital case is generally insufficient to constitute a federal constitutional claim. *See Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000). Furthermore, a review of the record establishes that the defense theory of the case was adequately covered by the self-defense and imperfect self-defense instructions. Under these instructions, the jury was permitted to consider whether Petitioner believed he was in imminent danger, and the use of deadly force was necessary to defend against the danger. *See* CALCRIM No. 505 (Dkt. No. 13-3 at 864); CALCRIM No. 522 (Dkt. No. 13-3 at 857); and CALCRIM No. 571 (Dkt. No. 13-3 at 857-58). During questioning by the police, Petitioner stated that the victim bit his hand, drawing blood, scratched his back, and tried to block his exit from her apartment. Dkt. No. 13-3 at 178-79; 186. Petitioner further stated that the victim "scares" him. Dkt. No. 13-3 at 187. At closing, defense counsel argued self-defense, emphasizing that Petitioner was provoked, "reacting to the bite" and from the victim blocking his exit from the apartment. Dkt. No. 13-6 at 909-10.

In any event, the evidence adduced at trial was insufficient to support a heat of passion instruction. Under California law, murder is defined as "the unlawful killing of a human being ... with malice aforethought." Cal. Pen. Code § 187(a). "Malice" exists "when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature," "when no considerable provocation appears" or "when the circumstances attending the killing show an abandoned and malignant heart." *Id.* § 188. Manslaughter is defined as "the unlawful killing of a human being without malice" and is deemed voluntary when "upon a sudden quarrel or heat of passion," *id.* § 192(a), or when the perpetrator "kills in 'unreasonable self-defense—the unreasonable but good faith belief in having to act in self-defense[.]' " *People v. Rios*, 23 Cal.4th 450, 460 (2000) (quoting *People v. Breverman*, 19 Cal.4th 142, 153-54 (1998)). "These mitigating circumstances reduce an intentional, unlawful killing from murder to voluntary manslaughter by negating

the element of malice that otherwise inheres in such a homicide." *Rios*, 23 Cal.4th at 461 (internal quotation marks omitted) (emphasis excluded).

"[T]he factor which distinguishes the 'heat of passion' form of voluntary manslaughter from murder is provocation." *People v. Lee*, 20 Cal.4th 47, 59 (1999). "The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim, or be conduct reasonably believed by the defendant to have been engaged in by the victim." *Id.* (internal citation omitted). "[T]he conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." *Id.*

Petitioner's own description of the circumstances surrounding the altercation reveals that he was not so inflamed by the victim's conduct that he acted "rashly or without due deliberation and reflection." Petitioner told the police that he and the victim were sleeping in her apartment when she suddenly woke him up, bit him on the hand, and said, "You got to go. You got to go." Dkt. No. 13-4 at 30. Petitioner, who was "half-asleep" and "still just waking up" at that point, got "a little nervous" because he claims the victim had an object in her hand. Dkt. No. 13-3 at 204-05; Dkt. No. 13-4 at 32. However, he denied hitting or pushing her. Dkt. No. 13-3 at 204-05. At most, he "just moved her out" of the way so that he could leave. *Id.* He then "went home, and jumped back in bed [because he] was so tired." Dkt. No. 13-4 at 31. While Petitioner did state that he was upset, he clarified that his anger stemmed solely from his inability to find his clothes, shoes, wallet, or keys as he was trying to leave. Dkt. No. 13-3 at 180-81.

In addition, even if the Court could assume somehow that the trial court erred by failing to instruct the jury on heat of passion voluntary manslaughter, Petitioner still is not entitled to relief because any such error would have been harmless. *See Brecht*, 507 U.S. at 637. The jury was presented with evidence of the victim's multiple injuries, which were inconsistent with a simple push as Petitioner claimed; and the multiple hostile and

Case No. 21-01744 BLF (PR)
ORDER DEN. PET. FOR WRIT OF HABEAS CORPUS; DEN. CERTIFICATE OF APPEALABILITY

United States District Court
Northern District of California

1    threatening messages he left on her voicemail.  The trial court properly instructed the jury

2    on the defense theory of voluntary manslaughter based on imperfect self-defense, which

3    the jury rejected. Thus, it is reasonable to conclude that the jury would have returned a

4    murder verdict even if instructed on heat of passion voluntary manslaughter.

5            Although Petitioner may have wanted the additional instruction, the instructions in

6    this case were adequate to encompass the defense theory of the case, and Petitioner fails to

7    show that he was prejudiced by the alleged instructional error. *See Del Muro*, 87 F.3d at

8    1081; *Brecht*, 507 U.S. at 637. Accordingly, habeas relief is DENIED on this claim.

9            **2.      Evidence of the Victim's Mental Health**

10                   **a.   Background**

11           Petitioner next contends the trial court erred by excluding evidence of the victim's

12   mental health, to wit, schizophrenia.  He claims that this evidence was relevant to her

13   credibility and whether she was a trustworthy reporter of prior injuries.  The facts

14   underlying this claim, as relayed by the state appellate court, are as follows:

15                   At trial, defense counsel suggested that aspects of O.C.'s
                 behavior "would be relevant in terms of [an Evidence Code
16               section] 780-type of credibility analysis." [FN3] Counsel
                 indicated that one of O.C.'s daughters "would describe the
17               behaviors of [O.C.] expressing that things are being moved, and
                 that might be associated with her schizophrenia and that she—
18               that [O.C.] is schizophrenic, but does not take her medications."
                 Counsel also discussed calling Nurse Bell to describe "erratic
19               behavior on [a hospital] campus and associated this with
                 possible mental instability." The trial court responded: "I had
20               made clear from the beginning that the issue of the diagnosis of
                 [O.C.] as schizophrenic, or the fact that she was prescribed
21               medication related to that, that those issues were off limits in this
                 trial, and that no one would be allowed to testify as to those
22               issues." The court then ruled that O.C.'s daughter could be
                 questioned about her mother's conduct if she testified, but the
23               nurse would not be allowed to testify. O.C.'s daughter did not
                 testify at trial. Later, the court denied a motion for mistrial
24               following testimony from Dr. Niemi that O.C. stated defendant
                 had been stealing her medications and her keys.

25
                        [FN3 Evidence Code section 780 provides that in
26                      determining the credibility of a witness, the trier
                        of fact may consider any matter that has any
27

28

United States District Court
Northern District of California

1

2

3

tendency in reason to prove or disprove the truthfulness of the witness's testimony, including, but not limited to, demeanor while testifying, and the extent of his or her capacity to perceive, recollect, or communicate. (*See People v. Cooks* (1983) 141 Cal.App.3d 224, 302.)]

4

*Roberts*, 2020 WL 477383, at *8.

5

### b. The State Appellate Court's Rejection of This Claim

6

The state appellate court rejected this claim, holding that Petitioner had not shown

7

how the victim's mental health would have affected her ability to recall and convey events:

8

9

10

11

12

13

14

"[T]he mental illness or emotional instability of a witness can be relevant on the issue of credibility, and a witness may be cross-examined on that subject, if such illness affects the witness's ability to perceive, recall or describe the events in question." (*People v. Gurule* (2002) 28 Cal.4th 557, 591–592.) A defendant may challenge the credibility of a declarant on the same bases as the credibility of a witness. (*People v. Blacksher* (2011) 52 Cal.4th 769, 806 (*Blacksher*).) The trial court has "broad discretion" to determine whether to admit such evidence. (*People v. Herring* (1993) 20 Cal.App.4th 1066, 1072.) "On appeal, a trial court's decision to admit or not admit evidence ... is reviewed only for abuse of discretion." (*People v. Williams* (1997) 16 Cal.4th 153, 196–197.)

15

16

17

18

[¶] Defendant contends the refusal to allow him to present evidence of O.C.'s schizophrenia violated his constitutional rights. He asserts the omitted evidence would have undercut her accusations that defendant stole her medicines (and her keys), and would have suggested her claims that defendant had choked her in the past were "at least exaggerated, if not totally false." We disagree.

19

20

21

22

23

24

25

26

27

It is "a fact of modern life that many people experience emotional problems, undergo therapy, and take medications for their conditions. 'A person's credibility is not in question merely because he or she is receiving [or has received] treatment for a mental health problem.' " (*People v. Anderson* (2001) 25 Cal.4th 543, 579.) In determining whether to allow mental health evidence, a court should consider " 'the nature of the psychological problem, the temporal recency or remoteness of the condition, and whether the witness suffered from the condition at the time of the events to which she is to testify.' [Citation.] For example, a mental illness that causes hallucinations or delusions is generally more probative of credibility than a condition causing only depression, irritability, impulsivity, or anxiety. [Citations.] And a trial court generally may preclude cross-examination about psychiatric treatment occurring many years before the trial or hearing at which the

28

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

> witness testifies and long before the events to which the witness testifies." (*Id*. at pp. 608–609 (conc. opn. of Kennard, J.).)

> Notably, the record is silent as to when Nurse Bell observed O.C.'s erratic behavior, and the trial court indicated that this information was stale. Moreover, defendant does not indicate that he was prepared to establish a medical foundation for O.C.'s alleged condition. Apart from Nurse Bell's observations and the statements that O.C.'s daughter would have made had she testified, defendant does not specify any evidence that he sought to admit regarding any diagnoses or medications for O.C.'s supposed psychiatric illness, much less how the illness affected her ability to accurately recall and describe her interactions with defendant during the relevant time frame. The trial court was well within its discretion to exclude testimony of questionable value.

9    *Roberts*, 2020 WL 477383, at *8-9.

10                c.  **Analysis**

11            Petitioner fails to show that habeas relief is warranted on this claim.  The

12    Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused

13    has the right to "be confronted with the witnesses against him." U.S. Const. amend. VI.

14    The federal confrontation right applies to the states through the Fourteenth Amendment.

15    *Pointer v. Texas*, 380 U.S. 400, 403 (1965).

16            The ultimate goal of the Confrontation Clause is to ensure reliability of evidence,

17    but it is a procedural rather than a substantive guarantee. *Crawford v. Washington*, 541

18    U.S. 36, 61 (2004). It commands not that evidence be reliable, but that reliability be

19    assessed in a particular manner: by testing in the crucible of cross-examination. *Id*.; *see*

20    *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974) (noting a primary interest secured by the

21    Confrontation Clause is the right of cross-examination). The Confrontation Clause

22    guarantees an opportunity for effective cross-examination, not cross-examination that is

23    effective in whatever way, and to whatever extent, the defense might wish. *Delaware v.*

24    *Fensterer*, 474 U.S. 15, 20 (1985) (per curiam); *see, e.g.*, *Coleman v. Calderon*, 150 F.3d

25    1105, 1112 (9th Cir. 1998) (Confrontation Clause does not require that prosecutor disclose

26    evidence that will help defense effectively cross-examine a prosecution witness), rev'd and

27

28

1    remanded on other grounds, 525 U.S. 141, 147 (1998). Accordingly, "trial judges retain

2    wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits

3    on such cross-examinations based on concerns about, among other things, harassment,

4    prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or

5    only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

6         Petitioner argues that the trial court should have permitted evidence of the victim's

7    mental health because it would have undermined some of her statements—namely, that

8    Petitioner took her medication and house keys and that he had choked her in the past. But

9    the Supreme Court "has never held that the Confrontation Clause entitles a criminal

10   defendant to introduce extrinsic evidence for impeachment purposes." *Nevada v. Jackson*,

11   569 U.S. 505, 511 (2013) (criticizing court of appeals for "elid[ing] the distinction between

12   cross-examination and extrinsic evidence by characterizing the cases as recognizing a

13   broad right to present 'evidence bearing on [a witness'] credibility" and noting that no

14   Supreme Court decision has clearly established that Constitution is violated when trial

15   court excludes extrinsic evidence of specific instances of a witness's conduct to impeach

16   credibility). Thus, Petitioner's claim under the Confrontation Clause fails.

17        Furthermore, the fact that Petitioner has invoked his due process rights does not

18   render his otherwise state evidentiary claim a cognizable federal claim. A federal habeas

19   petitioner may not transform a state-law issue into a federal one merely by making a

20   general appeal to a constitutional guarantee, such as the right to due process. *See Gray v.*

21   *Netherland*, 518 U.S. 152, 163 (1996). For this reason, the Ninth Circuit repeatedly has

22   held that a habeas petitioner's mere reference to the Due Process Clause is insufficient to

23   render his claims viable under the Fourteenth Amendment. *See Cacoperdo v.*

24   *Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994); *Miller v. Stagner*, 757 F.2d 988, 993-94

25   (9th Cir. 1985).

26

27

28

United States District Court
Northern District of California

Regardless, even if Petitioner had asserted a cognizable challenge to the trial court's decisions, that challenge would not entitle Petitioner to habeas relief. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' " *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)) (citations omitted); *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). But the right to present relevant evidence is subject to reasonable restrictions, such as state evidentiary rules. *Moses v. Payne*, 555 F.3d 742, 757 (9th Cir. 2009); *see also LaJoie v. Thompson*, 217 F.3d 663, 668 (9th Cir. 2000) (observing that right to present evidence in criminal case " 'may, in appropriate circumstances, bow to accommodate other legitimate interests in the criminal trial process' ") (quoting *Michigan v. Lucas*, 500 U.S. 145, 149 (1991)). Indeed, "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.' " *Green v. Lambert*, 288 F.3d 1081, 1090 (9th Cir. 2002) (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998)) (emphasis in original). The Supreme Court, moreover, has "indicated its approval of 'well-established rules of evidence [that] permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.' " *Moses*, 555 F.3d at 757 (quoting *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006)).

The Ninth Circuit has observed that "[t]he Supreme Court has found a violation of the right to present a complete defense [only] in cases where a state evidentiary rule, on its face, 'significantly undermined fundamental elements of the defendant's defense,' but did little or nothing to promote a legitimate state interest." *United States v. Pineda-Doval*, 614

Case No. 21-01744 BLF (PR)
ORDER DEN. PET. FOR WRIT OF HABEAS CORPUS; DEN. CERTIFICATE OF APPEALABILITY

21

F.3d 1019, 1033 n.7 (9th Cir. 2010) (emphasis added). Specifically, the Supreme Court has struck down rules that "preclude[ ] a defendant from testifying, exclude[ ] testimony from key percipient witnesses, or exclude[ ] the introduction of all evidence relating to a crucial defense." *Moses*, 555 F.3d at 758.

Petitioner has not shown a violation of his due process rights. As an initial matter, there was no evidence in the record that the victim had ever been diagnosed as schizophrenic. On the contrary, defense counsel at one point referred to the victim as having "undiagnosed schizophrenia." Dkt. No. 13-5 at 457. Thus, testimony by Nurse Bell and the victim's daughter in that regard would have lacked foundation and raised a litany of other issues. In addition, the record reveals that the trial court *would* have permitted testimony by the victim's daughter about her mother's behavior (though not a schizophrenia diagnosis), but defense counsel ultimately declined to call her to testify. *See* Dkt. No. 13-5 at 1598-99. Further, it appears that Nurse Bell's testimony was too remote in time to be relevant, a determination that Petitioner does not contest. Dkt. No. 13-6 at 1000. Even more, Petitioner has not shown how the victim's alleged schizophrenia would have affected her ability to recollect or relay information about the incident preceding her death.

But even if such evidence had been admitted, there was significant evidence to corroborate the victim's claims, including testimony from the first responders, photographs of the victim's multiple injuries, and the defense expert's testimony that the victim died by homicide (though this expert opined that the cause of death was complications arising from blunt force trauma to the head, whereas the prosecution's expert opined that the cause of death was complications arising from blunt trauma with neck compression). Dkt. No. 13-6 at 2121-22. With the weight of this evidence, any dispute as to the victim's credibility concerning her claim that Petitioner choked her was unlikely to have influenced the jury's verdict. In the absence of a showing of prejudice, habeas relief is DENIED on this claim. *See Brecht*, 507 U.S. at 637.

United States District Court
Northern District of California

### 3.   Trial Court's Response to Jury's Question

#### a.  Background

In his third claim for relief, Petitioner argues that the trial court erred when it "refused" to respond to one of the jury's questions. Underlying this claim is CALCRIM No. 520, which instructed the jury as follows:

> To prove that the defendant is guilty of [murder], the People must prove that:
>
>> 1. The defendant committed an act that caused the death of another person;
>>
>> 2. When the defendant acted, he had a state of mind called malice aforethought;
>>
>> AND
>>
>> 3. He killed without lawful excuse or justification.
>
> There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder.
>
> The defendant acted with *express malice* if he unlawfully intended to kill.
>
> The defendant acted with *implied malice* if:
>
>> 1. He intentionally committed an act;
>>
>> 2. The natural and probable consequences of the act were dangerous to human life;
>>
>> 3. At the time he acted, he knew his act was dangerous to human life;
>>
>> AND
>>
>> 4. He deliberately acted with conscious disregard for human life.
>
> Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time.
>
> An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have

happened without the act. A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.

There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death. A substantial factor is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death

If you decide that the defendant committed murder, it is murder of the second degree, unless the People have proved beyond a reasonable doubt that it is murder of the first degree as defined in CALCRIM No. 521.

Dkt. No. 13-3 at 857 (emphasis in original).

During deliberations, the jury asked the following question concerning CALCRIM No. 520:

For the 2nd element of implied malice, is "natural and probable consequences were dangerous to human life" a higher, lower, or comparable standard to "potentially fatal"[?] May we have further explanation of "dangerous to human life"[?]

Dkt. No. 13-3 at 817.

To this, the trial court responded:

There is no further description or explanation for the phrase "natural and probable consequences of the act were dangerous to human life" other than what has been provided in Instruction 520.

There is no further description or explanation for the phrase "dangerous to human life" other than what has been provided in Instruction 520.

Dkt. No. 13-3 at 818.

**b. The State Appellate Court's Rejection of This Claim**

The state appellate court rejected Petitioner's contention that the trial court's response to the jury question was erroneous, a determination it made both on procedural grounds and on the merits:

" 'When the trial court responds to a question from a deliberating jury with a generally correct and pertinent statement of the law, a party who believes the court's response should be modified or

1
2
3
4
5
6
7

clarified must make a contemporaneous request to that effect; failure to object to the trial court's wording or to request clarification results in forfeiture of the claim on appeal.' " (*People v. Boyce* (2014) 59 Cal.4th 672, 699.) When a defendant approves of the trial court's response to a jury question during deliberations, any claim of error with respect to that response is forfeited. (*People v. Bohana* (2000) 84 Cal.App.4th 360, 373; *see People v. Loza* (2012) 207 Cal.App.4th 332, 350.) While defendant asserts the record fails to show that the trial court offered counsel the opportunity to comment on either the jury's question or the trial court's answer, the minutes reflect that the court and counsel discussed questions from the jury in chambers. Counsel thereafter did not make any record of any objection to the court's response to the jury.

8
9
10
11
12
13
14
15
16

In any event, defendant's contention fails on its merits. Contrary to defendant's suggestion, the trial court did not "throw up its hands" or tell the jury that it could not respond to its question. "[T]he trial court does not abuse its discretion when it determines the best way to aid the jury is by directing the jury to reread the applicable jury instructions that 'are themselves full and complete.' " (*People v. Lua* (2017) 10 Cal.App.5th 1004, 1017.) "Section 1138 imposes upon the court a duty to provide the jury with information the jury desires on points of law" (*People v. Smithey* (1999) 20 Cal.4th 936, 985), but "[t]his does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.)

17
18
19
20
21
22
23

CALCRIM No. 520 is a correct statement of the law. (*See People v. Dellinger* (1989) 49 Cal.3d 1212, 1222 (upholding CALJIC No. 8.11, the analogue to CALCRIM No. 520; *see also People v. Knoller* (2007) 41 Cal.4th 139, 152.) We also reject defendant's contention that the court allowed the jury to convict him on the basis that his actions created a mere possibility of death rather than a high probability of death. It is settled that an act that is "dangerous to human life" is equivalent to an act that has a "high probability" of death. (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 111.) We presume jurors are capable of understanding jury instructions and applying them to the evidence, and that this jury followed the court's instruction to reread CALCRIM No. 520 and applied the appropriate elements. (*People v. Carey* (2007) 41 Cal.4th 109, 130.)

24

*Roberts*, 2020 WL 477383, at *9-10.

25

**c.  Analysis**

26
27
28

The state appellate court's denial of this claim on an independent state procedural ground forecloses review here. The state appellate court first determined that Petitioner's claim was forfeited because defense counsel did not make a record before the trial court.  It then alternatively rejected petitioner's claim on the merits. By employing the phrase "[i]n any event," the Court of Appeal " 'clearly and expressly' state[d] that its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. 255, 263 (1989) ("a state court need not fear reaching the merits of a federal claim in an alternative holding").

Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Forfeiture based on California's contemporaneous objection rule qualifies as an independent and adequate state law ground. *See Zapata v. Vasquez*, 788 F.3d 1106, 1111 (9th Cir. 2015) (failure to object to prosecutorial misconduct imposes procedural bar). Accordingly, Petitioner's third claim is procedurally defaulted.

The procedural bar may be lifted, however, if Petitioner demonstrates cause and prejudice for the default. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991) (given procedural default, federal habeas review "is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.").

To bypass the procedural default, Petitioner asserted on appeal that his trial counsel was ineffective for failing to object to the trial court's response to the jury question. Although the state appellate court did not address this argument, it did deny the claim.

Cause may be shown by establishing constitutionally ineffective assistance of counsel, but attorney error short of constitutionally ineffective assistance of counsel does not constitute cause and will not excuse a procedural default. *See McCleskey v. Zant*, 499

United States District Court
Northern District of California

United States District Court
Northern District of California

1   U.S. 467, 494 (1991); *Murray v. Carrier*, 477 U.S. 478, 486-88. Counsel's mere failure to

2   recognize the factual or legal basis for a claim, or failure to raise the claim despite

3   recognizing it, does not constitute cause.  *See Carrier*, 477 U.S. at 486; *Villafuerte v.*

4   *Stewart*, 111 F.3d 616, 629 (9th Cir. 1997).

5         To establish good cause on the ground of ineffective assistance of counsel, a

6   petitioner must show that (1) counsel made errors so serious that counsel was not

7   functioning as the counsel guaranteed the defendant by the Sixth Amendment, and (2) the

8   deficient performance prejudiced the defense. *Loveland v. Hatcher*, 231 F.3d 640, 644 (9th

9   Cir. 2000) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).  When deciding

10  whether ineffective assistance of counsel constitutes cause for procedural default, AEDPA

11  deference is not given to the state court determination on that claim; ineffectiveness of

12  counsel is decided "de novo" under *Strickland.  Visciotti v Martel*, 839 F.3d 845, 865 (9th

13  Cir. 2016).

14        Turning to the trial court's response to the jury question, "[w]hen a jury makes

15  explicit its difficulties, a trial judge should clear them away with concrete accuracy."

16  *Bollenbach v. United States*, 326 U.S. 607, 612-13 (1946).  The trial judge has a duty to

17  respond to the jury's request for clarification with sufficient specificity to eliminate the

18  jury's confusion.  *See Beardslee v. Woodford*, 358 F.3d 560, 574-75 (9th Cir. 2004)

19  (harmless due process violation occurred when, in responding to request for clarification,

20  court refused to give clarification and informed jury that no clarifying instructions would

21  be given); *United States v. Frega*, 179 F.3d 793, 808-11 (9th Cir. 1999) (trial judge's

22  confusing response to jury's questions raised possibility that verdict was based on conduct

23  legally inadequate to support conviction).  The formulation of the response to a jury's

24  question is a stage at which defense counsel can make a valuable contribution.

25  *See Musladin v. Lamarque*, 555 F.3d 830, 839-41 (9th Cir. 2009) (discussing importance

26  of defense counsel's participation in the formulation of a response to a jury question).

27

28

1
2
3
4
5
6
7
8
9

But when a trial judge responds to a jury question by directing its attention to the precise paragraph of the constitutionally adequate instruction that answers its inquiry, and the jury asks no follow-up question, a reviewing court may "presume[] that the jury fully understood the judge's answer and appropriately applied the jury instruction." *Waddington v. Sarausad*, 555 U.S. 179, 196 (2009).  After all, the trial judge has wide discretion in charging the jury, a discretion which carries over to the judge's response to a question from the jury.  *Arizona v. Johnson*, 351 F.3d 988, 994 (9th Cir. 2003). And just as a jury is presumed to follow its instructions, it is presumed to understand a judge's answer to a question.  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Petitioner has not established good cause on the ground of ineffective assistance of counsel to overcome the procedural bar to this claim. First, Petitioner is incorrect when he claims that the trial court "refused to answer the jury's questions." *See* Pet. at 11. Plainly, the trial court responded by referring the jury to CALCRIM No. 520, which is an adequate response. To the extent Petitioner claims that the trial court should have provided further clarification, he has not shown that this was necessary. Petitioner argues that the jury applied an incorrect legal standard, namely, by equating "potentially fatal" with "natural and probable consequences were dangerous to human life." But as noted, it is presumed that the jury understood and followed the instructions provided. Indeed, the California Supreme Court has determined that CALCRIM No. 520 has " 'straightforward language' " that would be understood by a reasonable juror. *People v. Knoller*, 41 Cal.4th 139, 152 (2007). And the record reflects that the jury did not ask any follow-up questions, suggesting that it deemed the trial court's response sufficient. Petitioner has not overcome these presumptions or otherwise shown that CALCRIM No. 520 or the trial court's response to the jury question was deficient.

25
26

This Court thus concludes that Petitioner's trial counsel was not ineffective for failing to object to the trial court's response to the jury question. Without adequate cause to

27
28

United States District Court
Northern District of California

overcome the independent state procedural bar, this claim is DENIED as procedurally barred.

### 4.    Hearsay Testimony

#### a.  Background

Petitioner's fourth claim for relief arises from the trial court's admission of the victim's reports that previously Petitioner had choked and abused her, as relayed by four witnesses: C.H., the victim's daughter; A.C., the victim's sister; Connie Swain, who worked with an agency that helped victims of domestic violence; and John McDonald, a resident services coordinator for the building in which Petitioner and the victim lived. Petitioner argues that such testimony did not fall under any hearsay exception and was irrelevant. He further argues that the trial court should have instructed the jury to limit its use of the statements to the victim's state of mind.

The facts underlying this claim, as summarized by the state appellate court, are set forth here:

> Prior to jury selection, defendant filed a motion in limine objecting to the admission of statements O.C. made regarding prior uncharged acts under both state hearsay rules and under the Sixth Amendment of the United States Constitution and *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) and *People v. Livingston* (2012) 53 Cal.4th 1145. In opposition, the prosecutor argued the evidence was admissible to counter defendant's story that the parties had reconciled. The trial court denied the motion, finding the statements were admissible under the hearsay exception for evidence of a declarant's state of mind to show O.C.'s mental state of fear and revulsion toward defendant.

*Roberts*, 2020 WL 477383, at *10.

#### b.  State Appellate Court's Rejection of This Claim

The state appellate court held that the victim's hearsay statements were intended to establish her state of mind, not the truth of the matter asserted, and were thus relevant to counter Petitioner's defense theory:

Case No. 21-01744 BLF (PR)
ORDER DEN. PET. FOR WRIT OF HABEAS CORPUS; DEN. CERTIFICATE OF APPEALABILITY

United States District Court
Northern District of California

Evidence Code section 1250 "provides an exception [to the hearsay rule] for 'evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health).' In order for this exception to apply, the statement must not have been made under circumstances indicating a 'lack of trustworthiness' [citation], and must be offered either 'to prove the declarant's state of mind, emotion, or physical sensation,' or 'to prove or explain acts or conduct of the declarant.' [Citation.] A prerequisite to this exception is that the declarant's mental state or conduct be placed in issue. [Citation.] 'Evidence of the murder victim's fear of the defendant is admissible when the victim's state of mind is relevant to an element of the offense.' [Citation.] Such evidence is also admissible when the defendant claims that the victim has behaved in a manner inconsistent with that fear." (*People v. Kovacich* (2011) 201 Cal.App.4th 863, 884–885.)

Case law makes clear that a self-defense claim to a murder charge can open the door for the prosecution to introduce evidence demonstrating that the victim's state of mind was inconsistent with conduct attributed to him or her by the defendant. (*People v. Spencer* (1969) 71 Cal.2d 933, 945 [self–defense claim to manslaughter charge opened door for prosecution to introduce evidence that defendant was the aggressor, including a statement the victim made to a friend expressing her fear that the defendant would become violent and kill her once she broke up with the defendant]; *People v. Escobar* (2000) 82 Cal.App.4th 1085, 1090, 1092 [trial court did not abuse its "broad discretion" by allowing rebuttal witness to testify that a few weeks before the shooting, the victim told her that she wanted to divorce the defendant but was afraid of him because he had told her that if she left him he was going to kill her]; *see Waidla*, *supra*, 22 Cal.4th at pp. 708–710, 723 [murder victim's statements two months before her death that she feared the defendant were admissible under state of mind exception to show she did not consent to defendant's presence in her house].)

In the trial proceedings below, C.H., testified that in 2012, O.C. said defendant had struck and abused her. A.C. testified that two weeks before the murder, O.C. stated that defendant had beaten and choked her and threatened to kill her because she would not have sex with him. Swain testified that defendant was entering O.C.'s apartment without her permission, that he choked her and she was afraid for her life, and that she wanted to change the locks on her doors. McDonald similarly testified that according to O.C., defendant had stolen her keys, choked her, and had abused her in the past. As the trial court found, these statements were probative of O.C.'s state of mind at the time of the murder and were introduced to rebut defendant's contentions that the two had reconciled and that O.C. had been the aggressor who assaulted defendant. O.C.'s fear that defendant might kill her and that he was gaining access to her apartment without her

consent were clearly relevant to the matters at hand and admissible under Evidence Code section 1250.

Defendant's reliance on *People v. Noguera* (1992) 4 Cal.4th 599, is misplaced. In *Noguera*, our Supreme Court held that the hearsay statements of a victim's fear of the defendant, "when offered to prove the conduct of the accused, are not within the exception to the hearsay rule embodied in Evidence Code section 1250." (*Noguera*, at p. 622.) The victim's state of mind was not at issue in that case because the prosecution focused solely on the identity of the killer. (*Ibid*.) Here, O.C.'s state of mind was placed at issue by defendant's defense at trial. We find no abuse of discretion.

Defendant alternatively argues that the trial court erred by refusing to give his proposed limiting instruction. Defendant's proposed instruction would have specifically identified claims of prior abuse that O.C. made to Swain, McDonald, and A.C., and told the jury that these statements were not offered as proof of the underlying facts. Instead, the court told the jury: "During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other." Defendant claims the standard instruction was insufficient because the court never told the jury that the statements recounted by Swain and A.C. were for O.C.'s state of mind and not for their truth.

The fault lies with defendant, however. At the outset of McDonald's testimony, defense counsel objected that the evidence should be limited to state of mind. After a sidebar, the trial court told the jury: "The questions that are being asked of Mr. McDonald, ... to the extent he is describing conversations with [O.C.], the statements that [O.C.] has made to him are offered for the truth as it relates to [O.C.'s] state of mind. [¶] They are not offered for the truth as to whether the statements that [O.C.] makes about other people's conduct are true. [¶] It's just as to her state of mind." Defendant did not similarly object to the testimony of Swain and A.C. and the court did not issue any advisory to the jury. Defendant forfeited the claim by failing to object below to the other witnesses or to seek a pinpoint limiting instruction.

Even if his claim had not been forfeited, we would conclude that any error in the failure to provide a modified limiting instruction is harmless. Significant testimony was adduced at trial concerning O.C.'s statements to medical personnel, police officers, and other witnesses which detailed a long history of physical abuse by defendant and O.C.'s fear of him and efforts to get away. The challenged statements by these four witnesses is largely cumulative of other, properly admitted evidence. Accordingly, it is not reasonably probable that the jury's verdicts would have been different had it been given the

United States District Court
Northern District of California

requested limiting instruction. (*See People v. Watson* (1956) 46 Cal.2d 818, 836.)

*Roberts*, 2020 WL 477383, at *10-11.

### c. Analysis

A state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process. *See Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985*), cert. denied*, 478 U.S. 1021 (1986). Therefore, Petitioner's challenge to the trial court's rulings on the admissibility of the victim's statements is not reviewable on this federal habeas petition.

However, the admission of evidence may be subject to federal habeas review if a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir.), *cert. denied*, 479 U.S. 839 (1986). On this issue, the Confrontation Clause is invoked, but it does not provide the requested relief for Petitioner because it applies only to "testimonial" statements. *See Crawford*, 541 U.S. at 50-51. "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* at 51 (internal quotation and citation omitted); *see id.* ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.").  The Confrontation Clause applies not only to in-court testimony but also to out-of-court statements introduced at trial, regardless of the admissibility of the statements under state laws of evidence. *Crawford*, 541 U.S. at 50-51.

United States District Court
Northern District of California

1    Confrontation Clause claims are subject to harmless error analysis.  *United States v.*

2    *Nielsen*, 371 F.3d 574, 581 (9th Cir. 2004) (post-*Crawford* case); *see also United States v.*

3    *Allen*, 425 F.3d 1231, 1235 (9th Cir. 2005).  For purposes of federal habeas corpus review,

4    the standard applicable to violations of the Confrontation Clause is whether the

5    inadmissible evidence had an actual and prejudicial effect upon the jury.  *See Hernandez v.*

6    *Small*, 282 F.3d 1132, 1144 (9th Cir. 2002) (citing *Brecht*, 507 U.S. at 637).

7    The state appellate court did not rule on Petitioner's Confrontation Clause

8    argument, but it did deny the claim. "When a federal claim has been presented to a state

9    court and the state court has denied relief, it may be presumed that the state court

10    adjudicated the claim on the merits in the absence of any indication or state-law procedural

11    principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011).

12    Petitioner's Confrontation Clause argument fails because none of the challenged

13    statements can be classified as "testimonial." The victim's statements to her daughter and

14    sister are clearly not testimonial as neither of them is a law enforcements officer or a

15    person charged with uncovering or prosecuting criminal behavior. *See Ohio v. Clark*, 576

16    U.S. 237, 245 (2015). Similarly, the victim's statements to Connie Swain and John

17    McDonald were in the context of a restraining order (a civil matter) and moving

18    apartments, respectively. As neither individual was involved in investigating or

19    prosecuting a criminal matter, these statements are also not testimonial. Hearsay that is not

20    testimonial, "while subject to traditional limitations upon hearsay evidence, is not subject

21    to the Confrontation Clause."  *Davis v. Washington*, 547 U.S. 813, 821 (2006); *see also*

22    *Whorton v. Bockting*, 549 U.S. 406, 420 (2007) (noting that under *Crawford*, "the

23    Confrontation Clause has no application to [nontestimonial] statements and therefore

24    permits their admission even if they lack indicia of reliability.").

25    Moreover, the Confrontation Clause does not bar the use of testimonial statements

26    for purposes other than establishing the truth of the matter asserted.  *Crawford*, 541 U.S. at

27

United States District Court
Northern District of California

United States District Court
Northern District of California

59 n.9; *see Moses v. Payne*, 555 F.3d 742, 761 (9th Cir. 2009) (finding state court properly admitted son's out-of-court statement to social worker that his father had kicked his mother; statement was introduced to show why social worker contacted Child Protective Services, not to prove defendant had kicked the victim).  In Petitioner's case, the victim's statements were not admitted to prove that Petitioner had previously choked or abused her. Rather, they were admitted to show the victim's state of mind. This did not violate the Confrontation Clause, and the state appellate court's rejection of this claim was not objectively unreasonable. Additionally, any alleged error stemming from the admission of the victim's statements via these four witnesses was harmless because their testimony was merely cumulative of other uncontested evidence, including statements the victim made to police officers and first responders. *Brecht*, 507 U.S. at 637.

Lastly, Petitioner contends that the trial court should have provided a clarifying instruction following the testimony of each of these four witnesses, directing the jury to consider the victim's statements to establish state of mind only. As the state appellate court noted, though, defense counsel only objected to the testimony of John McDonald. *See* Dkt. No. 13-5 at 699. In response to the objection, the trial court instructed the jury to consider the statements made by the victim only for her state of mind, not for the truth. *Id.* Defense counsel did not similarly object to the testimony of the other witnesses and did not request a clarifying instruction as to them. Because the state appellate court rejected this contention on state procedural grounds, and Petitioner has not demonstrated cause, this Court will not consider it here. Petitioner's fourth claim is therefore DENIED.

**5.     The 911 Call**

**a.  Background**

Petitioner next argues that his rights under the Confrontation Clause were violated when the trial court admitted the 911 call made by the security guard after he was

1    approached by the victim. The state appellate court summarized the facts underlying this

2    claim as follows:

3        Defendant next claims the trial court erred in admitting the 911
         call in which Clark relayed that O.C. told him defendant had
4        choked and abused her. The trial court overruled a defense
         objection and admitted the call under Evidence Code section
5        1240, the hearsay exception for spontaneous utterances. On
         appeal, defendant asserts the hearsay exception does not apply
6        and that the admission of the 911 call violated his confrontation
         rights under *Crawford*.

7    *Roberts*, 2020 WL 477383, at *11.

8               **b.   State Appellate Court's Rejection of This Claim**

9           The state appellate court held that the trial court's admission of the 911 call did not

10   violate the Confrontation Clause because the hearsay statements were not testimonial:

11       Under Evidence Code section 1240, "Evidence of a statement is
         not made inadmissible by the hearsay rule if the statement: [¶]
12       (a) Purports to narrate, describe, or explain an act, condition, or
         event perceived by the declarant; and [¶] (b) Was made
13       spontaneously while the declarant was under the stress of
         excitement caused by such perception." " '[T]he basis for the
14       circumstantial trustworthiness of spontaneous utterances is that
         in the stress of nervous excitement, the reflective faculties may
15       be stilled and the utterance may become the instinctive and
         uninhibited expression of the speaker's actual impressions and
16       belief.' " (*People v. Saracoglu* (2007) 152 Cal.App.4th 1584,
         1588.) In a multiple, nested hearsay situation, the multiple
17       hearsay is admissible only "if each hearsay layer separately
         meets the requirements of a hearsay exception." (*People v. Arias*
18       (1996) 13 Cal.4th 92, 149.) The decision to admit evidence
         under Evidence Code section 1240 is reviewed for abuse of
19       discretion. (*People v. Phillips* (2000) 22 Cal.4th 226, 236.)

20       Although Clark was not a percipient witness to defendant's
         assault on O.C., he observed her injuries and witnessed O.C.'s
21       emotional recounting of defendant's violent actions. While
         defendant suggests Clark, as a security guard, would not find the
22       situation emotionally charged or stressful, a violent crime had
         just occurred and Clark knew defendant had not been detained
23       and could be nearby. Under the circumstances, we cannot
         conclude that the trial court abused its discretion in determining
24       that both levels of hearsay qualified as spontaneous utterances.
         (*See People v. Roldan* (2005) 35 Cal.4th 646, 713–714 (*Roldan*),
25       overruled on other grounds in *People v. Doolin* (2009) 45
         Cal.4th 390, 421, fn. 22.)

26

27   Case No. 21-01744 BLF (PR)

28   ORDER DEN. PET. FOR WRIT OF HABEAS CORPUS; DEN. CERTIFICATE OF APPEALABILITY

35

United States District Court
Northern District of California

United States District Court
Northern District of California

We also find no confrontation clause issues are present because the statements at issue were not testimonial. While the *Crawford* opinion does not provide a definition of testimonial statements, "in *Davis v. Washington* (2006) 547 U.S. 813, the high court gave this explanation: 'Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.' " (*People v. Romero* (2008) 44 Cal.4th 386, 421.) The California Supreme Court has added that "statements are not testimonial simply because they might reasonably be used in a later criminal trial. Rather, a critical consideration is the primary purpose of the police in eliciting the statements. Statements are testimonial if the primary purpose was to produce evidence for possible use at a criminal trial; they are nontestimonial if the primary purpose is to deal with a contemporaneous emergency such as assessing the situation, dealing with threats, or apprehending a perpetrator." (*Id.* at p. 422.) Here, the manifest purpose of the 911 call was to deal with an ongoing emergency only.

Further, any possible confrontation problem was avoided when Clark testified at trial and was available for cross-examination. (*Roldan*, *supra*, 35 Cal.4th at p. 714, fn. 26.) In sum, Clark's 911 call was not made and received "primarily" to "establish or prove some past fact for possible use in a criminal trial." (*People v. Cage* (2007) 40 Cal.4th 965, 984, italics omitted.) Because his statements were not testimonial, they were properly admitted over defendant's confrontation clause objection. (*People v. Banos* (2009) 178 Cal.App.4th 483, 494.)

*Roberts*, 2020 WL 477383, at *11-12.

### c.  Analysis

Petitioner is not entitled to relief on his claim that the admission of the 911 call violated his right to confront witnesses. In *Crawford*, the Supreme Court held that the Sixth Amendment bars admission of testimonial statements of a witness who does not appear at trial, unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. 541 U.S. at 53-54. *Crawford* did not define the term "testimonial," but gave examples of statements that are testimonial in nature, including " 'extrajudicial statements ... contained in formalized testimonial materials, such as

1    affidavits, depositions, prior testimony, or confessions," "statements that were made under

2    circumstances which would lead an objective witness reasonably to believe that the

3    statement would be available for use at a later trial," and statements made during police

4    interrogations. *Id.* at 51-52.

5          Under the "primary purpose" test, statements are testimonial when they result from

6    questioning, the primary purpose of which was to establish past events potentially relevant

7    to a later criminal prosecution. *Davis v. Washington*, 547 U.S. at 822. Statements are not

8    testimonial when the primary purpose of questioning is to enable police assistance to meet

9    an ongoing emergency. *Id.* To determine the primary purpose, the court objectively

10   evaluates the circumstances in which the encounter occurred and the statements and

11   actions of the parties. *Michigan v. Bryant*, 562 U.S. 344, 359 (2011).

12         First, the security guard testified at trial and was subject to cross-examination. Dkt.

13   No. 13-5 at 604-13. Accordingly, admission of his out-of-court statements does not

14   implicate the Confrontation Clause. *See Crawford*, 541 U.S. at 59 n. 9 ("when the

15   declarant appears for cross-examination at trial, the Confrontation Clause places no

16   constraints at all on the use of his prior testimonial statements").

17         Second, the victim's statements during the 911 call were not testimonial. The

18   challenged statements were made to the 911 operators in the course of an ongoing

19   emergency to allow the operators to assess what help was needed and where, to determine

20   the identity and location of the suspect who might have posed an ongoing threat to the

21   community, and to help the security guard render aid while waiting for rescue personnel.

22   Dkt. No. 13-3 at 582-89; *see Davis*, 547 U.S. at 827-28 (victim's statements to 911

23   operator while her environment was not yet safe were nontestimonial); *Bryant*, 562 U.S. at

24   371-78 (although wounded victim drove away from crime scene before calling police, his

25   statements to responding police officers identifying shooter and describing circumstances

26   of shooting were made in the course of ongoing emergency and were nontestimonial); *see*

27

28

United States District Court
Northern District of California

1    *also Gann v. Diaz*, No. 12cv1418-JAH (BLM), 2018 WL 4385371, at *8 (S.D. Cal. Sept.

2    14, 2018), aff'd, 802 F. App'x 283 (9th Cir. 2020) (911 call was not testimonial so as to

3    implicate confrontation principles where call was made during an ongoing emergency and

4    911 operator sought information regarding the physical description of the suspect, the

5    suspects mode of transportation and direction of flight, who was in the home, the layout of

6    the residence and the location of the victim in the home, and whether first responders

7    would be able to gain access to the house).

8          For these reasons, the state appellate court's rejection of Petitioner's claim

9    regarding the admission of the 911 call was not contrary to, or an unreasonable application

10   of, federal law. Habeas relief is not warranted on this claim.

11         **6.     Instruction on Intimate Partner Battering**

12              **a.  Background**

13         Petitioner also argues that the trial court erred when it instructed the jury that it

14   could consider the expert testimony on intimate partner battering in evaluating the victim's

15   credibility. The state appellate court summarized the facts underlying this claim as follows:

16              The jury was instructed per CALCRIM No. 850 that Lemon's
                testimony about intimate partner battery "is not evidence that the
17              defendant committed any of the crimes charged against him. [¶]
                You may consider this evidence only in deciding whether or not
18              [O.C.'s] conduct was not inconsistent with the conduct of
                someone who has been abused and in evaluating the
19              believability of her testimony." [FN5] The jury also was
                instructed that it could disregard any opinion, including an
20              expert witness's opinion that it found unbelievable,
                unreasonable, or unsupported by the evidence.
21
22              [FN5 Defendant observes the phrasing of the
                instruction is technically incorrect since O.C. did
23              not testify. As we have already noted, a defendant
                may challenge the credibility of a statement by a
24              declarant in the same way that he challenges the
                credibility of a witness. (Evid. Code, § 1202;
25              *Blacksher*, *supra*, 52 Cal.4th at p. 806.)

     *Roberts*, 2020 WL 477383, at *13.
26

27              **b.  State Appellate Court's Rejection of This Claim**

United States District Court
Northern District of California

United States District Court
Northern District of California

The state appellate court found no error, concluding that the instruction adequately

admonished the jury that the expert testimony was not to be considered as proof of abuse:

> Evidence of intimate partner battering is admissible to explain "a behavior pattern that might otherwise appear unreasonable to the average person." (*People v. Day* (1992) 2 Cal.App.4th 405, 419, disapproved on another issue in *People v. Humphrey* (1996) 13 Cal.4th 1073, 1089.) "Because juries may accord undue weight to an expert's opinion, special care must be taken to insure the jury understands its duty to independently assess the expert opinion along with and in light of all other relevant evidence." (*People v. Housley* (1992) 6 Cal.App.4th 947, 957.) Defendant relies on *People v. Bledsoe* (1984) 36 Cal.3d 236, 247–248, a case involving expert testimony of rape trauma syndrome, in which the Supreme Court determined that expert testimony could not be used to prove a rape actually occurred. Our high court reasoned that " '[p]ermitting a person in the role of an expert to suggest that because the complainant exhibits some of the symptoms of rape trauma syndrome, the victim was therefore raped, unfairly prejudices the appellant by creating an aura of special reliability and trustworthiness.' " (*Id.* at p. 251.)
>
> CALCRIM No. 850 properly cautioned the jury to use Lemon's testimony for the limited purpose of evaluating O.C.'s statements. It did not suggest that O.C. was telling the truth or that the battering had, in fact, occurred. It specifically admonished the jurors they could not consider the evidence as proof that the act actually occurred. As such, the instruction properly advised the jury of the importance of intimate partner battering evidence and also its limitations. *Bledsoe* is therefore inapposite.
>
> Defendant also complains that allowing the expert to testify on the basis of hypothetical questions patterned after the facts of this case was error. This claim has been rejected by our Supreme Court. (*People v. Vang* (2011) 52 Cal.4th 1038, 1051 ["it was not a legitimate objection that the prosecutor failed to disguise the fact he was asking about an assault based on the one that the evidence showed the defendants committed"].) In light of our conclusion, we do not address defendant's prejudice contentions.

*Roberts*, 2020 WL 477383, at *13.

### c.   Analysis

"The admission of evidence does not provide a basis for habeas relief unless it

rendered the trial fundamentally unfair in violation of due process." *Holley v. Yarborough*,

568 F.3d 1091, 1101 (9th Cir. 2009) (internal quotation marks and citation omitted). "A

habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision." *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005). Evidence introduced by the prosecution will often raise more than one inference, some permissible and some not, and it is up to the jury to sort them out in light of the trial court's instructions. *Id*. (citing *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991)). "Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must be of such quality as necessarily prevents a fair trial." *Jammal*, 926 F.2d at 920 (internal quotation marks, emphasis, and citation omitted).

When an evidentiary error claim is governed by the Section 2254(d)(1) standard, federal habeas review is even more restricted. The Ninth Circuit has explained that "[u]nder AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." *Holley*, 568 F.3d at 1101. "The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process," and "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Id*.; *see also Greel v. Martel*, 472 F. App'x 503, 504 (9th Cir. 2012) ("There is ... no clearly established federal law that admitting prejudicial evidence violates due process.")

Petitioner does not challenge the expertise of the witness, simply that the witness's expert testimony made it more likely that the jury would believe that the victim suffered domestic violence at the hands of Petitioner. But like all experts' testimony designed to influence a jury's factual determinations, the admission of the expert's testimony in this case was designed to perform the same function. Petitioner has cited not a single federal case, much less Supreme Court case, for the proposition that expert testimony on domestic

abuse violates due process. Moreover, the jury was specifically admonished that the expert's "testimony about intimate partner battering is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not [the victim]'s conduct was not inconsistent with the conduct of someone who has been abused, and in evaluating the believability of her testimony." Dkt. No. 13-3 at 861. In the absence of "clearly established Federal law" on this issue, and considering the clear directive of CALCRIM No. 850, habeas relief is DENIED on Petitioner's sixth claim.

### 7.    Cumulative Error

Lastly, Petitioner asserts cumulative error. The state appellate court rejected this claim as follows: "As we have found no prejudicial error in this case, defendant's claim of cumulative error necessarily fails." *Roberts*, 2020 WL 477383, at *13.

"[T]he Supreme Court has clearly established that the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even where each error considered individually would not require reversal." *Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Chambers v. Mississippi*, 410 U.S. 284, 290 n.3, 298, 302-03 (1973)). Cumulative error does not merit relief unless the errors "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 927 (quoting *Donnelly*, 416 U.S. at 643). A cumulative error claim is "rarely successful." *Smith v. Wasden*, 747 F. App'x 471, 478 (9th Cir. 2018).

Here, the Court has found that none of Petitioner's claims has merit. Because this Court has found no constitutional violation occurred with regard to any of the foregoing claims, there can be no cumulative error. *See Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011) ("Because we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible."). Habeas relief on this claim is also DENIED.

## IV.  CONCLUSION

After a careful review of the record and pertinent law, the Court concludes that the Petition must be **DENIED**.

Further, a Certificate of Appealability is **DENIED**.  *See* Rule 11(a) of the Rules Governing Section 2254 Cases.  Petitioner has not made "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure.  *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

The Clerk shall terminate any pending motions, enter judgment in favor of Respondent, and close the file.

**IT IS SO ORDERED**.

Dated:_____July 11, 2022_____

BETH LABSON FREEMAN
United States District Judge